UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| JECHT REVAN, An Individual<br><br>                      Plaintiff,<br>v.<br><br>UNIVERSITY OF DENVER<br>DEPARTMENT OF CAMPUS SAFETY,<br><br>                      Defendant. | Case No.: |

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff Jecht Revan ("Mr. Revan" or "Plaintiff"), by and through his counsel brings this action against University of Denver Department of Campus Security ("DCS"), and hereby states and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has Federal Question Jurisdiction over the action pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado.

3. The action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* and the Colorado Anti-Discrimination Act, C.R.S. § 24-31-401, *et. seq.*

4. This Court has Supplemental Jurisdiction over Plaintiff's state claims under 28 U.S.C. § 1367.

**PARTIES**

5. Plaintiff is a legal resident of the United States and was, at all relevant times, a resident of and domiciled in the State of Colorado.

6. Plaintiff was an employee of Defendant.

7. The defendant in this matter is University of Denver Department of Campus Security, is a department of A Private Institution of Higher Education, with it's principal place of business at 2130 S. High St., Denver, CO 80208.

## ADMINISTRATIVE PREREQUISITES

8. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 11, 2023. (EEOC Charge No. 5H-2024-00259 attached hereto as **Exhibit A**.). After a one-year investigation, Mr. Revan received a Notice of Right to Sue (NTRS) on November 19, 2024.

9. Plaintiff timely instituted this action within 90 days of his NTRS.

## RELEVANT FACTS

10. The facts alleged in the Plaintiff's EEOC Charge, Exhibit A, are incorporated in this paragraph as if fully state herein.

11. Plaintiff is a 40-year-old male of Native American, Israeli, and Jewish descent.

12. Mr. Revan was hired by DCS in April of 2022. He was soon promoted to Corporal at the end of September 2022.

13. Shortly after this promotion, Mr. Revan witnessed a male coworker massage the shoulders of a female coworker. He approached the female coworker and asked if she had a relationship with the man, or if she was uncomfortable. She did not have a relationship with that coworker and was uncomfortable with the physical contact.

14. The very next day the department had Title 9 training. In this training, Mr. Revan learned that they were all mandatory reporters. If they witnessed or learned of any discrimination or harassment, they were required to report it to the Title 9 office.

15. After this training, Mr. Revan went to Seargent Kimo Malott and informed him of the harassment he had witnessed the previous day. Seargent Malott's response was "I wish you hadn't told me that because now I have to tell the Captain." Mr. Revan found Seargent Malott's comment surprising and disturbing. Eventually Captain Hasty called Mr. Revan and informed him that they would be handling the issue internally. Mr. Revan questioned if they needed to report it to the Title 9 office. The Captain then became very aggressive and told Mr. Revan that if he reported it to the Title 9 office he would be fired.

16. Mr. Revan knew this was inappropriate and asked for that statement in writing. Captain Hasty informed Mr. Revan that he doesn't have the authority to request anything in writing and ended the conversation abruptly.

17. As a result of this conversation, Mr. Revan did not report the incident to the Title 9 office, as he feared for his job. He remains unaware of any actions that have been taken to address the harassment.

18. Shortly after this conversation, where Captain Hasty threatened Mr. Revan's job, Mr. Revan submitted a complaint against the Captain. Several months prior, Mr. Revan had been discussing potential new programs and opportunities with the Director of Campus Safety Michael Bunker. Mr. Revan collected information and materials relevant to these new programs, as requested by Director Bunker, and sent it to Captain Hasty, as is proper procedure to go through the chain of command.

19. For three months the Captain did not respond to Mr. Revan, forward the information on, or even acknowledge that he had received it.

20. Mr. Revan shared the information with Captain Hasty again and requested it be sent on to Director Bunker, and for another month Captain Hasty did nothing with it.

21. On or around September 2022, Mr. Revan happened to pass Director Bunker in the hallway and mentioned that he had gathered all the information and was working on getting it over to him. The very next day Mr. Revan was called into Captain Hasty's office. Captain Hasty was enraged by Mr. Revan's short hallway conversation with Director Bunker. Captain Hasty was yelling, shaking, and the meeting was all around threatening Mr. Revan. Captain Hasty told Mr. Revan that if he ever went above his head, he would make sure he never worked in security again. This new threat was just days after Captain Hasty threatened to fire Mr. Revan.

22. In this same meeting, Seargent Malott and Captain Hasty required Mr. Revan to request permission anytime he needs to speak to anyone in the chain of command. Mr. Revan pointed out that it would make discussions about problems he has with someone in the chain of command difficult. The two leaders did not care.

23. Over the next few months, Mr. Revan attempted to request permission to speak to Director Bunker a few times, but it was always denied. Mr. Revan managed to submit a complaint to Director Bunker, but nothing came of it. Mr. Revan soon gave up attempting to report his Seargent and Captain.

24. Mr. Revan worked with Ms. Madison Carney ("Ms. Carney") frequently. Ms. Carney was another corporal, and a student who does frequent campus outreach programs and connects well with students. Despite Mr. Revan and Ms. Carney being peers and holding the same position, Corporal, she frequently told him that she was above him, that he needed to "fall in line," and that he needed to follow her orders.

25. Ms. Carney was also very vocal about her sexuality and minority identity while working with Mr. Revan. Ms. Carney informed Mr. Revan that she was bisexual and said that he

would never understand her because he is an "old white man." Mr. Revan informed her that he was not white. She asked what he identified as, and Mr. Revan questioned why it mattered.

26. On another occasion, Mr. Revan told Co-worker 1 that you can't discern someone's identity just by looking at them. MS. Carney responded again that he would never understand because he is not a minority.

27. Around Halloween, Ms. Carney informed Mr. Revan that she would be at a party without her boyfriend and invited him to come see her. To Mr. Revan's recollection, when he responded that they were not friends, Ms. Carney responded that they could be "more than friends." Mr. Revan asked Ms. Carney to keep their relationship professional.

28. Ms. Carney's sexual advances and derogatory comments about Mr. Revan not understanding minorities occurred on a weekly basis starting in July 2022.

29. Over the months, Mr. Revan had to ask Ms. Carney several times to stop harassing him. She would respond "what are you going to do about it? I am one of the only females in the department, they'll never believe you over me."

30. In the last week of October Ms. Carney initiated an Internal Affairs ("IA") investigation against Mr. Revan. Her complaint was based on the belief that she was his superior, he was supposed to be following her orders, and he had not been. When Mr. Revan was informed of this IA investigation by Seargent Malott, he shared how Ms. Carney had been treating him. Seargent Malott informed Mr. Revan that he would not be investigating his claims because Ms. Carney is young and a woman" and that "[Command Staff] won't believe you." The IA investigation concluded that Ms. Carney's claims were baseless. Mr. Revan asked Command Staff what would happen to Ms.

Carney as a result of this attack on his character and her previous harassment. They told him she would face no repercussions.

31. In December 2022, Mr. Revan was wrongly accused of using excessive force during an encounter with a bike thief after the thief shoulder checked Mr. Revan and physically threatened him with a weapon.

32. The Denver Police Department arrived on the scene shortly after the thief escaped. They informed Mr. Revan that he had handled the situation appropriately and had not done anything wrong.

33. DCS claims that there is security footage and witnesses that saw the use of force. However, the footage is from a below- ground level parking garage and does not show anything other than Mr. Revan's feet. There is no audio. Additionally, the singular witness was also in the lower level of the parking garage and did not see what occurred. DCS' investigation claims that Mr. Revan ordered the thief to the ground and was physically violent with the thief without cause as the thief tried to escape.

34. DCS terminated Mr. Revan because
    a. He was not using force to prevent a crime, as the crime was no longer occurring.
    b. He had acted against policy by responding without waiting for backup.

35. Mr. Revan's termination letter from DCS states that he pepper sprayed the thief, but does not mention throwing the thief to the ground. DCS' description of the incident is not consistent and differs greatly from Mr. Revan's account.

36. Mr. Revan is an instructor on de-escalation, and crisis intervention with the Douglas County Sherriff's office, and also teaches programs on defensive tactics approved by the

University of Denver. Mr. Revan is also POST certified as a Peace Officer. Mr. Revan is acutely aware of what response is appropriate in the context of apprehending a thief.

37. If any employee is terminated for an excessive use of force DCS is required to make a report to Denver Excise and Licensing, and the Commission on Accreditation for Law Enforcement Agencies. DCS did not make a report to either of these two organizations when Mr. Revan was terminated.

38. Mr. Revan filed both formal and informal grievances after his termination, but neither process yielded a result. Mr. Revan is concerned that animus from Seargent Malott and Captain Hasty impacted his termination decision and infected the grievance process. Each subsequent appeal of his termination was evaluated and ultimately upheld based on information provided by men that had already demonstrated an intent to have Mr. Revan removed.

39. Furthermore, multiple DCS employees were involved in similar excessive use of force claims but were not disciplined as harshly as Mr. Revan. Two months prior to Mr. Revan's incident, Mr. Michael Roll (peer, "Mr. Roll") responded to a call about a person fondling students. He did not wait for backup and responded alone. By the time he arrived at the scene, the crime was no longer ongoing, and when the perpetrator swung a fist at Mr. Roll, he threw the subject to the ground.

40. Additionally, a mere month before Mr. Revan's incident, Seargent Malott responded to a call of an intoxicated student. Seargent Malott did not wait for backup and initiated physical restraint despite no crime occurring or evidence that the perpetrator was going to attack. Neither Mr. Roll nor Seargent Malott were terminated, despite much clearer evidence of an excessive use of force.

41. After Mr. Revan's termination, he interviewed and was one of the top candidates for several other jobs, including with the Denver Police Department and Aurora Police Department, among others. His background check and reference checks had already been completed. Two days after his termination, Mr. Revan received phone calls from several of the places he had applied to, asking to update his background. Mr. Revan has worked in the security and law enforcement sector for over a decade. He has applied to many jobs and has never had a potential employer call to update his background after the background and reference checks had already been completed. Mr. Revan believes that Seargent Malott and Captain Hasty followed through on their threats made in September 2022, to ensure he would never work in security again.

42. Mr. Revan inquired of one of the hiring managers as to why they had changed their minds regarding him. The manager told him that the background investigator had been informed that Mr. Revan "beat the shit out of a homeless man without cause." This claim is not true, Mr. Revan has never "beat the shit" out of anyone, with or without cause.

## COMPLAINT FOR DISCRIMINATION

## GENDER BASED AND RACE AND COLOR BASED HARASSMENT

43. Mr. Revan was harassed by Ms. Carney on the basis of race and color, and his gender. Under EEOC guidelines, harassment is unwelcome conduct based on a protected class that is severe or pervasive enough to create a hostile work environment that a reasonable person would consider intimidating, hostile, or abusive.[1]

---

[1] EEOC Harassment Guidance, https://www.eeoc.gov/harassment (last accessed August 16, 2023). The employer is automatically liable for harassment performed by supervisors, but may also be liable for

44. First, Mr. Revan is part of a protected class. Ms. Carney was harassing him based on both his gender – male – and based on his race or color – or Ms. Carney's perception of his race and color. Ms. Carney told Mr. Revan that they could be "more than friends" and repeatedly told him that no one would believe him, a man, over her, a woman, if he were to complain about her harassment. Ms. Carney also repeatedly told Mr. Revan that he could never understand her or other minorities because he is an "old white man." Ms. Carney was harassing Mr. Revan based on his color with these statements. Furthermore, even if Ms. Carney) was factually incorrect, she still legally discriminated against him because she believed he was white. She would not have made those comments otherwise.

45. Second, Mr. Revan did not welcome this behavior from Ms. Carney. He repeatedly asked her to stop, requested that they keep their relationship professional, and even kept a log of all the things she said to him. The conduct was so unwelcome that Mr. Revan reported Ms. Carney to his supervisor in an effort to get support from another party. However, he was told that they would do nothing, as she was a woman that was well-liked, and the department does not typically investigate complaints against women.

46. Third, Ms. Carney created a work environment that Mr. Revan found to be intimidating, hostile, and abusive, and a reasonable person would also find to be intimidating, hostile, and abusive. Ms. Carney threats that no one would believe him were intimidating, Mr. Revan feared that she would start making false allegations. Her repeated demands that he follow her orders, fall in line, or do what she told him were abusive. She attempted to assert power over him, despite their jobs being peers. She eventually did start an internal

---

harassment by co-workers or non-employees over whom it has control if it knew or should have known about the harassment and failed to take prompt and corrective action. *Id.*

affairs investigation against Mr. Revan, creating a hostile environment. Any reasonable person would find Ms. Carney's threats, demands, and fabricated investigations to be intimidating, hostile, and abusive.

47. Colorado has recently passed the Protecting Opportunities and Workers' Rights Act ("POWR Act"). The Legislature rejected the federal "severe or pervasive" standard for workplace harassment, reasoning that the standard "does not take into account the realities of the workplace or the harm that workplace harassment causes." Colo. Rev. Stat. § 24-34-400.2(2)(b). Instead, a plaintiff must now only show the harassment was unwelcome and does not need to show that it escalated to a hostile work environment. *Id.*

48. Mr. Revan has certainly established that the harassment from Ms. Carney was unwelcome. He repeatedly asked her to keep their relationship professional, asked her to stop harassing him, and even reported her behavior to his supervisors. Even though he can show that the workplace was hostile, and Ms. Carney's actions were severe and pervasive, under the new Colorado law he is not required to.

49. DCS is liable for Ms. Carney's actions, as it was aware of the harassment and failed to take any corrective action.

50. Mr. Revan reported all of Ms. Carney's harassment to his supervisor. He was told that the complaints would not be investigated, and she would face no repercussions.

51. This is not the first time that the University of Denver has faced allegations that its sexual harassment investigation procedures have an anti-male bias. John Doe filed a case against the University in 2021, alleging that their investigation into accusations of sexual assault were discriminatory against him because he was male. Doe had provided multiple witnesses and consistent fact statements, while the complainant Jane Roe provided

conflicting and inconsistent statements, multiple contradictory witnesses, and refused to provide pieces of evidence, yet the sexual harassment investigatory process still ruled in favor of Roe. The University claimed that their sexual harassment investigation procedures do not have an anti-male bias, but instead have a pro-complainant bias. However, the Circuit Court held that procedural deficiencies, numerous inconsistencies, failure to gather exculpatory evidence, and statistical anomalies were sufficient to prove that the Universities stated non-discriminatory reason was pretextual.

52. Similar to Doe's case, Mr. Revan's claims of sexual and gender-based harassment have gone un-investigated because of the University's anti-male bias. After Ms. Carney) initiated an IA investigation, Mr. Revan shared instances of sexual and gender-based harassment. He provided evidence in the form of a log he had kept of things he had said to him. Mr. Revan was explicitly told that department generally does not investigate complaints against women, and therefore nothing would be done. There was no investigation into Mr. Revan's claims. Additionally, the University cannot claim that there is merely a pro-complainant bias here because Mr. Revan was the complainant. This is clear evidence of anti-male bias.

53. Due to the general anti-male bias at University of Denver, female employees may feel that they can take advantage of males and treat them disparately. Mr. Revan argues that this is true in his case, where a female coworker threatened him and harassed him without fear of any consequences.

**DISCRIMINATION BASED ON RETALIATION**

54. The repeated harassment from coworkers and supervisors that Mr. Revan endured and filed complaints about eventually led to him being retaliated against. These facts are

applicable to multiple anti-retaliation policies at both the federal and state level. For the sake of brevity, Mr. Revan outlines his retaliation claim under the broadest retaliation framework, supplied by the EEOC.

55. Retaliation occurs when an employer takes a materially adverse action because an individual has engaged in, or may engage in, activity in furtherance of the EEO laws which the EEOC enforces. [2]All statutes enforced by the EEOC prohibit retaliation for engaging in a protected activity. Generally, a protected activity consists of either participating in an EEO process or opposing unlawful conduct. *Id.* The EEOC considers the act of making a disclosure or complaining of discriminatory behavior, on its own, to be a protected activity. *Id.*

56. There are three elements to prove a retaliation claim at the EEOC and under the federal laws upon which the EEOC bases its decisions.

57. The first element is that the employee engaged in a protected activity. The EEOC has clearly stated that, when it comes to analyzing cases under Title VII, participation can include a simple complaint, even if the complainant claims that the offender is discriminatory against other people (i.e. when the complainer is complaining on behalf of a third-party). In this case, Mr. Revan made complaints about how Ms. Carney was treating him and also reported sexual harassment he observed to his immediate supervisor.

58. He also reported his Seargent and Captain for their aggressive and controlling treatment

---

[2] *EEOC Enforcement Guidance on Retaliation and Related Issues*, No. 915.004 (Aug. 25, 2016), Enforcement Guidance on Retaliation and Related Issues | U.S. Equal Employment Opportunity Commission (eeoc.gov) (last accessed August 15, 2023); *also see Sauers v. Salt Lake City.*, 1 F.3d 1122, 1128 (10th Cir. 1993) explaining that the doctrine of anticipatory retaliation is incorporated into protected activity ("Action taken against an individual in anticipation of that person engaging in [protected activity] is no less retaliatory than action taken after the fact").

of him, and their failure to report sexual harassment to the Title IX office. In *EEOC v. PVNF, LLC*, the Plaintiff threatened to file a complaint of sexual harassment with the EEOC but did not actually do so until after she had resigned. *EEOC v. PVNF, LLC*, 487 F.3d 790, 804 (10th Cir. 2007). The Defendant argued that she could not have been retaliated against because she did not actually engage in a protected activity before her pay was cut and she was given a warning. However, the Court held that the prohibition against retaliation extends to protecting individuals that merely voice informal complaints to superiors. *Id.*, see also *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Though Mr. Revan did not file a formal report of the observed sexual harassment to the Title 9 office, he did voice his concerns to his superior.

59. Though Mr. Revan did not formally report Ms. Carney's harassment, he did provide evidence to his superiors of her harassment when an investigation was initiated against him and requested a resolution. Similar to the Plaintiff in PVNF, Mr. Revan was voicing informal complaints to his superiors, and those informal complaints are considered a protected activity.

60. The second element is that the employee experienced a materially adverse action. *Id.* Materially adverse frequently means that the action would deter a reasonable person from engaging in the protected activity. Mr. Revan was in fact deterred from engaging in protected activity when Captain Hasty threatened his job if he reported sexual harassment to the Title 9 office. He was again deterred in filing further reports on the harassing and aggressive behavior from Captain Hasty and Seargent Malott when the Captain threatened that he would ensure Mr. Revan never worked in security again if Mr. Revan went above his head to file any complaints. Additionally, the EEOC, Supreme Court, and

lower courts all agree that termination from employment is materially adverse. Mr. Revan was ultimately terminated in December, after his employer had found a pretextual and slanderous reason to terminate him for his multiple complaints and reports. Additionally, Mr. Revan continues to suffer adverse employment actions, as DCS' defamatory statements prevent him from finding desirable employment in the security or law enforcement field.

61. The third element requires a causal connection between the adverse employment action and the protected activity. Though proximity in time often is enough to create an inference that the adverse action and protected activity were causally connected, it is not the only way to show causality. Captain hasty and Seargent Malott's anger towards Mr. Revan increased each time Mr. Revan submitted another complaint. First, when Mr. Revan complained of sexual harassment on behalf of his coworker, Captain Hasty threatened Mr. Revan's job. Next, Captain Hasty feared Mr. Revan was going above his head to submit a complaint to Director Bunker, and Captain Hasty eliminated Mr. Revan's ability to submit future complaints and threatened Mr. Revan's future ability to find employment in the security industry. Then, when Mr. Revan complained of harassment (from Ms. Carney), he was ignored entirely and told none of his complaints would be investigated, despite evidence that he provided. The adverse action of termination can be tied these earlier complaints because the Captain fulfilled his threats to terminate Mr. Revan, and further fulfilled his threat to ensure Mr. Revan had difficulty finding work. The Captain also prevented Mr. Revan from filing any additional complaints after the aggressive September meeting, preventing him from creating a temporal connection.

62. DCS claims that Mr. Revan's termination was not due to retaliatory or discriminatory animus, but instead to his violation of University Policies, and his use of excessive force during an incident with a bike thief. If that were their legitimate reason for terminating Mr. Revan, DCS would have been required to report the incident to two different organizations and allow them to perform an investigation.

63. The Denver Police Department had already cleared Mr. Revan of any wrongdoing, and it is likely that subsequent investigations by these organizations would also clear Mr. Revan's name.

64. Additionally, Mr. Revan was treated differently and punished more severely than other DCS employees that had similar excessive use of force allegations, evidencing DCS' stated reason for termination is mere pretext.

65. Mr. Revan's superiors were angry with him because he stood up for other employees and himself, and that anger escalated with each subsequent report Mr. Revan submitted, until Mr. Revan's superiors were able to find a reason for his termination that they believed would cover up their true retaliatory motive.

66. Additionally, DCS' comments in response to Mr. Revan's reference checks were retaliatory. The EEOC's guidance on retaliation provides an example of a recent case where an employee was denied a promotion based on statements about her repeated EEO complaints made during her reference checks. "The EEOC found that the statements made during the reference check were retaliatory." *EEOC Retaliation – Making it Personal*, https://www.eeoc.gov/retaliation-making-it-personal (last accessed September 11, 2023). Similarly, Mr. Revan was denied job opportunities because of statements made (presumably by Seargent Malott and/or Captain Hasty) during his reference checks.

67. The reference check statements fit the three criteria for retaliation.

68. First, Mr. Revan had engaged in multiple protected activities. He had complained of sexual harassment on behalf of his coworker, he had complained of harassment from Ms. Carney, he had complained of Seargent Malott and Captain Hasty's treatment of him and their failure to report to Title IX, and he had engaged in the grievance process after his termination, stating that his termination was due to discrimination.

69. Second, the reference check statements caused Mr. Revan to suffer a materially adverse employment action. He was unable to get jobs for which he was a top contender, and because of required waiting periods, he is unable to reapply for a certain period of time. He has been forced to take another job outside the scope of his normal training and experience.

70. Finally, there is a causal connection between the reference check statements and Mr. Revan's inability to get a job in the security or law enforcement field. Captain Hasty explicitly told Mr. Revan that he would ensure he never works in security if he ever goes above his head to submit a complaint again. This threat has been fulfilled.

## DAMAGES

71. Plaintiff incorporates all paragraphs above as if fully set forth herein.

72. Plaintiff claims that as a result of Defendants actions and omissions, as outlined above and to be further proven at trial, he is entitled to damages.

73. Plaintiff claims compensatory and consequential damages as a result of Defendant's discrimination and retaliation against him.

74. Plaintiff also claims noneconomic damages related to emotional distress, anxiety, stress, and reputational harm directly related to Defendant's actions as alleged in this Complaint

and as will be proven at trial.

## RELIEF REQUESTED

75. Based on the above Plaintiff requests the following relief:

    a.  Declaratory Judgment as to all above Counts;

    b.  An order in Plaintiff's favor as to all above Counts;

    c.  All damages described in paragraphs 72-74, above, and as proven at trial;

    d.  Exemplary damages to the extent available; and

    e.  All other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully demands a jury trial on all issues so triable.

*/s/Brickelle Bro*
Brickelle Bro
300 Union Blvd. Suite 200
Lakewood, CO. 80228
brickelle@whitcomblawpc.com
303-534-1958